# United States Court of Appeals
## For the First Circuit

---

Nos. 01-2513, 01-2521

KPS & ASSOCIATES, INC.,

Plaintiff, Appellee,

v.

DESIGNS BY FMC, INC.,

Defendant, Appellant.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

---

Before

Lynch, Circuit Judge,

Bownes, Senior Circuit Judge,

and Lipez, Circuit Judge.

---

Nathan Lewin, with whom Alyza D. Lewin and Lewin & Lewin, LLP were on brief, for appellant.

Karen D. Hurvitz, with whom Theresa A. O'Loughlin was on brief, for appellee.

---

January 28, 2003

---

**LIPEZ, <u>Circuit Judge</u>**.  This acrimonious dispute between defendant-appellant Designs by FMC, Inc. ("Designs") and plaintiff-appellee KPS & Associates, Inc. ("KPS") is a diversity breach of contract action that comes to us following the entry of a default judgment against Designs and a damages award of $367,154 plus prejudgment interest.  Designs challenges the entry of default and the subsequent determination of damages, assigning error to several rulings of the district court.  These rulings include a denial of Designs' motion to dismiss (arguing that the federal action should be dismissed in favor of parallel state litigation) and a refusal to set aside the entry of default.  Designs also appeals the district court's assessment of $5,000 in sanctions.[1]

For the reasons stated below, we affirm the district court in all respects save one — the computation of the base quantum of damages after the entry of default.  In fixing that amount, the district court erred in its application of Rule 55(b)(2) of the Federal Rules of Civil Procedure (dealing with the determination of damages after an entry of default).

**I.**

**A.  The Relationship Between the Parties**

Since these appeals come to us following the entry of a default judgment, we derive the following factual background from

---

[1] In these consolidated appeals, Designs challenges the entry of default in No. 01-2513 and the award of sanctions in No. 01-2521.

-2-

the well-pleaded factual allegations contained in the complaint and the attachments thereto. Where appropriate, however, we note the factual contentions advanced by KPS and Designs on appeal, and we further elaborate on the facts as necessary in our discussion of the applicable law. See infra Section II.

KPS, an independent jewelry manufacturers' sales representative, is a Florida corporation registered to do business in Massachusetts, which is also its principal place of business. Its "principal in charge" is Kenneth Sayles. As KPS's counsel put it during the initial pretrial conference, KPS "is basically one person, Kenneth P. Sayles." Designs is an importer, seller, and distributor of silver jewelry to retail and department stores throughout the United States. It is a New York corporation with its principal place of business in Brooklyn. Its president and sole shareholder is William Nussen.

In 1987 KPS and Designs entered into an oral agreement whereby KPS agreed to secure new accounts for Designs. The parties dispute whether this relationship was to be exclusive. The complaint alleges that it was not, and that KPS was free to represent other jewelry distributors. KPS goes on to allege in its complaint that it secured new accounts for Designs with several different retailers, and that each time it secured a new account, Designs and KPS would agree on a commission schedule. Each month Designs would send KPS a statement detailing items shipped to

retailers, and then KPS would send Designs a statement detailing the commissions due arising out of those orders. According to the complaint, KPS became so successful in developing business for Designs that Designs agreed to forward $17,500 to KPS each month on account. This agreement was confirmed in a letter from Nussen to Sayles dated June 23, 1995, and attached to the complaint as an exhibit.

According to the complaint, Designs stopped sending statements to KPS in November 1995. By the end of 1995, Designs had fallen far behind in its payments to KPS — to the tune of $146,016 — and Designs remained behind in its payments through 1996. The complaint goes on to allege that in December 1996 Designs issued a statement purporting to reflect the commissions due KPS for 1996 sales. That printout failed to include significant sales of KPS, and the printout used erroneously low commission percentages.

At some point in 1997, KPS began representing Jasco, Inc., another jewelry distributor. According to the complaint, Jasco and Designs were not in direct competition since Jasco sold a "more limited, and somewhat different, product." KPS made no effort to conceal its relationship with Jasco. Upon learning of KPS's representation of Jasco in July 1998, Nussen contacted Sayles, demanding that KPS terminate its relationship with Jasco. Sayles refused because, according to the complaint, exclusive

representation had never been part of KPS's agreement with Designs. Shortly thereafter, Nussen sent Sayles a letter terminating the business relationship between Designs and KPS. The letter cited "irreconcilable differences" as the basis for this termination and indicated that KPS would be provided with a final accounting. The letter unilaterally limited the payment of unpaid commissions on future sales to those sales occurring within ninety days of the date of the letter. According to the complaint, given the purchasing timeline under which retailers operate, KPS was entitled to commissions on sales that occurred after that ninety-day period had expired. In any event, Designs never provided KPS with a final accounting, nor did Designs pay KPS the commissions it was claiming.

On April 27, 1999, KPS's counsel, Karen Hurvitz, sent a demand letter to Nussen seeking $131,035.37 in unpaid commissions. The demand letter indicated that KPS intended to proceed to litigation if Designs failed to meet its obligations. Three days later Nussen telephoned Hurvitz, leaving a message on her answering machine that he had no intention of paying any commissions to KPS. Approximately two weeks later Hurvitz received a call from David Schrader who identified himself as counsel for Designs. At this point there were some communications between Hurvitz and Schrader, the nature and extent of which are in dispute. In any event, Designs failed to pay the commissions as demanded.

On September 13, 1999, Designs filed a lawsuit in New York state court naming KPS and Sayles as defendants, and asserting eleven different causes of action, including breach of contract, fraud, breach of fiduciary duty, conversion, tortious interference, and "prima facie tort." The complaint sought over $5,000,000 in compensatory damages and $5,000,000 in punitive damages. The unverified complaint, however, lacked pertinent dates, did not detail KPS's alleged wrongdoings with any specificity, and did not indicate how Designs had calculated its enormous damages. The complaint also sought to enjoin KPS and Sayles from representing "any other merchants" despite the fact that Nussen had terminated Designs' relationship with KPS over a year earlier.

On September 22, 1999, Schrader faxed a copy of Designs' yet-to-be-served complaint to Hurvitz, together with a cover letter asking her to accept service on behalf of KPS and Sayles. In a separate letter faxed at the same time, Schrader indicated to Hurvitz that Designs would be willing to withdraw its suit if the parties could agree to "sign general releases in favor of each other releasing any claims they may have."

Two days later Hurvitz filed the instant lawsuit against Designs on behalf of KPS in the United States District Court for the District of Massachusetts. The complaint and its supporting affidavits detailed sales accounts with six different retailers and included copies of invoices from each of those retailers. The

complaint and the affidavit listed specific commissions due based on figures contained in those invoices. Although there are some inconsistencies and computational errors in the numbers, there appears to have been an attempt to draft the complaint and affidavit with some degree of specificity — in contrast to Designs' complaint filed in New York, which, as KPS describes it, was replete with generalized "boilerplate." KPS's complaint sounded in contract and quantum meruit, and also sought multiple damages pursuant to Chapter 93A of the Massachusetts General Laws (prohibiting "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce"). KPS's complaint also listed four local customers of Designs as trustees and requested attachments against each of them in the amount of $65,000. See Mass. Gen. Laws Ann. ch. 246, § 1 (West 2002).

## B. Procedural History

Following the filing of the complaint in this case, the litigation quickly bogged down in a messy motion practice. Both parties and their attorneys accused each other of misconduct and filed numerous motions for sanctions, to strike, to quash, to compel, and to disqualify. We recount only that portion of this sorry procedural history which is pertinent on appeal.

On October 19, 1999, an initial conference was held via telephone among counsel and the district court. Schrader, counsel

for Designs, had indicated to the court the day before that he did not oppose the entry of an order authorizing the trustee process. At the hearing, however, Schrader claimed that the district judge's courtroom deputy had erroneously led him to believe that the trustee process was "a question of getting authorization to serve papers, as opposed to an ex parte or on-notice attachment proceeding." He therefore asked for an extension of time in which to respond to the request for trustee process. The district court gave the parties until October 22 to file papers regarding the trustee process.

On October 25, after that deadline had expired without a filing by Schrader, he sought a further extension of time, citing difficulty in obtaining local counsel as the reason for the delay. The next day, Schrader faxed an affidavit from Nussen to the court, in which Nussen indicated that the reason for the delay in responding was the fact that "my daughter is being married **tonight**" (original emphasis). The next day, in lieu of a formal motion, Schrader faxed a "letter brief" to chambers in which he (a) indicated once again his difficulty in obtaining local counsel, (b) opposed the trustee process, and (c) argued that the court should dismiss or stay the proceedings in light of the New York litigation. On October 29, the district court, finding that KPS had demonstrated a reasonable likelihood of success on the merits,

issued an order allowing the trustee process and attaching the trustees' accounts payable to Designs.

At some point in November, Designs obtained an ex parte temporary restraining order in its New York lawsuit from a New York state criminal court judge sitting in an emergency civil part. The TRO restrained two of KPS's main customers from making payments to KPS. When the TRO was subsequently vacated on December 17, the New York court denied a further attempt by Designs to obtain an attachment against KPS. According to KPS's New York counsel, Schrader admitted to him and the New York court that the reason Schrader had sought the restraining order was because "if Sayles obtained an injunction in Boston, he wanted to obtain a similar one in New York." Also, according to KPS's New York counsel, Designs repeatedly failed to meet its discovery obligations in the New York litigation and failed to diligently prosecute its case.

Back in the Massachusetts litigation, KPS filed a motion on January 14, 2000, to compel Designs to retain local counsel. KPS and Designs also filed additional papers with regard to Designs' motion to dismiss. On February 3 the court granted KPS's motion to compel Designs to retain local counsel, ordering Designs to do so within seven days. Designs' local counsel, Brian Banks, did not file his appearance until five days after the seven-day deadline had passed. Banks, Schrader, and Hurvitz all appeared at a status conference on February 17, 2000, at which time the

district court announced that it would soon rule on Designs' motion to dismiss.  When it did, Designs would then have ten days in which to file its answer to KPS's complaint.  The next day, the district court, without opinion, endorsed as "denied" Designs' motion to dismiss.

Ten calendar days later, on March 1, 2000, Hurvitz submitted to the court a request for an entry of default since Designs had yet to file its answer.[2]  This request was served on Designs' New York and local counsel.  On March 10, 2000, the clerk entered a notice of default against Designs pursuant to Rule 55(a) of the Federal Rules of Civil Procedure.  Copies of the notice were served on all counsel.  On March 17, 2000, KPS filed a request for the entry of default judgment, which was likewise served on all counsel.

On March 21, 2000, Schrader finally took action, faxing a letter to the court in which he asserted that he had sent a timely answer on March 1, 2000, by Federal Express.  Shortly thereafter, Designs filed a motion to set aside the default, and the district court conducted a hearing on May 17, 2000.  At the close of the hearing, the district court ruled from the bench,

---

[2] This request was premature.  Under Rule 6(a) of the Federal Rules of Civil Procedure, Designs had until March 3, 2000, to file its answer since intervening Saturdays and Sundays would not have been included in the computation of time.  Designs, however, did not attempt to file its answer until almost three weeks later, rendering the question of the due date academic.

denying Designs' motion to set aside the entry of default. The court characterized Schrader's behavior over the course of the litigation as "stonewalling" and explicitly disbelieved Schrader's proffered explanation with regard to the filing of the answer. She told Schrader: "We have had trouble with you from the very beginning." She concluded: "And because I do not credit these stories, because I do not find there to be good cause to remove the default, the motion to remove the default is denied." One month later, on June 14, Designs filed a motion for reconsideration — styled as a motion pursuant to Rule 60(b). The court agreed to reconsider its prior ruling and then once again denied the request to set aside the entry of default.

Subsequently, on July 27, 2000, the court issued a brief written order on damages which stated, in part:

> No further hearing is necessary to ascertain the compensatory damages claimed as the verified complaint and plaintiff's affidavit attached thereto set forth a sum certain based on sales and commission figures there detailed, Pope v. United States, 323 US 1, 12 (1944); Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co., 771 F.2d 5 (1st Cir. 1985), and, a default having been entered, each of plaintiff's allegations of fact are established as a matter of law.

The district court then referred the matter to a magistrate judge for the sole purpose of determining whether Designs should be held liable for double or treble damages under Chapter 93A — i.e., to determine whether Designs' unlawful conduct was "willful or

-11-

knowing." The magistrate judge permitted no evidence on the base quantum of damages, which the court had fixed as the "sum certain" contained in the complaint and a supporting affidavit.

Following the hearing on 93A liability, the magistrate judge issued a Report and Recommendation finding that Designs had willfully and knowingly engaged in conduct prohibited by Chapter 93A and that KPS should be awarded double damages. Designs filed its objections to the Report and Recommendation with the district judge, who overruled those objections. Judgment was entered on September 28, 2001, for $367,154 — twice the $183,577 recited in the ad damnum clause of KPS's complaint — plus prejudgment interest. On October 23, 2001, Designs filed a timely notice of appeal.

In the days leading up to the Chapter 93A hearing, Designs had served subpoenas duces tecum on KPS's "custodian of records," KPS's "resident agent," KPS's bank, and Jasco. Copies were not served on KPS's counsel, and KPS's counsel only learned of them from the witnesses involved. KPS immediately moved to quash the subpoenas and also moved for sanctions, arguing that voluminous documents had been improperly sought and that they were irrelevant to the determination of Designs' liability under Chapter 93A. The motions were granted and the magistrate judge recommended a sanction of $5,000. Designs lodged its objections with the district judge, who overruled them on September 28, 2002. On

October 25, 2002, Designs filed a timely notice of appeal with regard to this imposition of sanctions.

## II.

### A.  The Motion to Dismiss

Designs claims that the district court erred in denying its motion to dismiss or stay the proceedings in light of the ongoing New York litigation.  The decision to dismiss or stay proceedings in light of parallel litigation is "necessarily left to the discretion of the district court in the first instance." Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1, 19 (1983). The district court's decision may be reversed only for an abuse of that discretion.  Elmendorf Grafica, Inc. v. D.S. Am. (E.), Inc., 48 F.3d 46, 50 (1st Cir. 1995).  The exercise of that discretion, however, is greatly constrained by what the Supreme Court has labeled an "exceptional-circumstances test." Cone, 460 U.S. at 19 (citing Colo. River Water Conservation Dist. v. United States, 424 U.S. 800 (1976)); Elmendorf, 48 F.3d at 50.  Pursuant to this test, "[t]here must be some extraordinary circumstances for a federal court to shrink from 'the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them.'" Currie v. Group Ins. Comm'n, 290 F.3d 1, 10 (1st Cir. 2002) (quoting Colo. River, 424 U.S. at 817).

Drawing on Colorado River and its progeny, courts look to a variety of factors to determine whether "exceptional

-13-

circumstances" exist which counsel the abdication of jurisdiction in favor of parallel state court litigation. Always keeping in mind the "heavy presumption favoring the exercise of jurisdiction," Villa Marina Yacht Sales, Inc. v. Hatteras Yachts, 915 F.2d 7, 13 (1st Cir. 1990), a court may consider: (1) whether either court has assumed jurisdiction over a res; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether state or federal law controls; (6) the adequacy of the state forum to protect the parties' interests; (7) the vexatious or contrived nature of the federal claim; and (8) respect for the principles underlying removal jurisdiction. Burns v. Watler, 931 F.2d 140, 146 (1st Cir. 1991). This list is by no means exhaustive, nor is any one factor necessarily determinative. Villa Marina, 915 F.2d at 12. Rather, "'a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counseling against that exercise is required.'" Id. (quoting Colo. River, 424 U.S. at 818-19).

Designs concedes that neither the first nor the second factor (jurisdiction over a res or inconvenience of the federal forum) weighs in favor of dismissal. We conclude that none of the others do either.

As for the concern about piecemeal litigation, "[d]ismissal is not warranted simply because related issues otherwise would be decided by different courts, or even because two courts otherwise would be deciding the same issues." Id. at 16. Rather, concerns about piecemeal litigation "should focus on the implications and practical effects of litigating suits deriving from the same transaction in two separate fora," Gonzales v. Cruz, 926 F.2d 1, 4 (1st Cir. 1991), and weigh in favor of dismissal only if there is some "exceptional basis" for dismissing one action in favor of the other. Burns, 931 F.2d at 146; see, e.g., Colo. River, 424 U.S. at 819-20 (finding that "clear federal policy [against piecemeal litigation] evinced in legislation" weighed in favor of dismissal); Liberty Mut. Ins. Co. v. Foremost-McKesson, Inc., 751 F.2d 475, 477 (1st Cir. 1985) (finding exceptional circumstances when there was "real possibility" that insurance policy might be interpreted differently in each forum, leaving insured with insufficient coverage after years of paying premiums). This case does not involve any such exceptional circumstances or implicate broad policy considerations. Rather, this dispute between a vendor and its sales representative over sales commissions presents "a straightforward application of state . . . laws," Burns, 931 F.2d at 143, and is of primary importance only to the immediate parties.

It is true that the New York lawsuit commenced several days before the instant case. However, the fourth factor relating

-15-

to the order of the lawsuits "should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." Cone, 460 U.S. at 21; Currie, 290 F.3d at 10. At the time the court heard Designs' motion to dismiss, the New York litigation was proceeding anemically, whereas KPS was prosecuting the instant case at an appreciable pace. This factor therefore does not weigh in favor of dismissal.

Designs notes correctly that no federal substantive law is implicated in this dispute. However, the presence of state law issues weighs in favor of dismissal in only rare circumstances — namely, "when a case presents 'complex questions of state law that would best be resolved by a state court.'" Villa Marina, 915 F.2d at 15 (quoting Am. Bankers Ins. Co. v. First State Ins. Co., 891 F.2d 882, 886 (11th Cir. 1990)); see, e.g., Currie, 290 F.3d at 11 (staying federal proceeding when "state law question [was] not clear" and court unsure "how the state ultimately would balance the important policy interests"). Hence, this factor does not weigh in favor of dismissal.

Designs insists that the instant litigation is "vexatious and reactive," and "a contrived, defensive reaction" to the New York lawsuit. We are unpersuaded. KPS sent a demand letter to Designs for $131,035.37 in unpaid commissions four months prior to the filing of the New York lawsuit by Designs. In that letter, KPS

declared its intention to file suit should the demand not be met. If anything, Designs' lawsuit against KPS for over $5,000,000 in compensatory damages and $5,000,000 in punitive damages could be viewed as a "contrived, defensive reaction" to KPS's demand letter.

Citing Villa Marina, Designs finally claims that the district court's summary denial of the motion to dismiss without opinion means that we must at least remand to the district court so that the court can justify its denial on the record. We disagree. This case concerns the denial of a motion to dismiss. In Villa Marina, the district court had granted the motion to dismiss without "balanc[ing] the factors in favor of dismissal against [the court's] obligation to exercise jurisdiction even in the face of duplication and judicial inefficiency." Villa Marina, 915 F.2d at 13. Given the heavy presumption in favor of exercising jurisdiction and the lack of merit in Designs' arguments, the district court was justified in summarily denying Designs' motion.

## B. The Entry of Default

Designs argues that the district court erred in denying its motion to set aside the entry of default. See Fed. R. Civ. P. 55(c). Designs also maintains that the default judgment should be vacated under Rule 60(b). We will address these two contentions in turn.

-17-

### 1. The Rule 55(c) Motion

a. Legal Standards

Rule 55(c) provides that a court may set aside an entry of default "for good cause shown."  We review the district court's denial of a Rule 55(c) motion for abuse of discretion, while we review any factual findings underlying that decision for clear error.  Conetta v. Nat'l Hair Care Ctrs., Inc., 236 F.3d 67, 75 (1st Cir. 2001); Gen. Contracting & Trading Co. v. Interpole, Inc., 899 F.2d 109, 112 (1st Cir. 1990).  We will not disturb the district court's decision unless it is "clearly wrong."  Bond Leather Co. v. Q.T. Shoe Mfg. Co., 764 F.2d 928, 938 (1st Cir. 1985).

Citing Coon v. Grenier, 867 F.2d 73 (1st Cir. 1989), Designs argues that we must look to three factors in scrutinizing the district court's ruling:  (1) whether the default was willful; (2) whether setting aside the default would have prejudiced KPS; and (3) whether Designs has a meritorious defense.  See id. at 76.  Since the district court did not comment in detail upon these three considerations, Designs argues that the district court abused its discretion.

The three factors cited by Designs are cited frequently in the cases as elements of the "good cause" analysis under Rule 55(c).  However, as we said in Coon, we would not "set forth any precise formula [for the good cause analysis], because we recognize

-18-

that each case must necessarily turn on its own unique circumstances." Id. As another court has put it, the three factors cited by Designs are not "talismanic," and we will consider others. CJC Holdings, Inc. v. Wright & Lato, Inc., 979 F.2d 60, 64 (5th Cir. 1992). In McKinnon v. Kwong Wah Restaurant, 83 F.3d 498 (1st Cir. 1996), we identified no fewer than seven factors a district court may consider:

> (1) whether the default was willful; (2) whether setting it aside would prejudice the adversary; (3) whether a meritorious defense is presented; (4) the nature of the defendant's explanation for the default; (5) the good faith of the parties; (6) the amount of money involved; (7) the timing of the motion [to set aside entry of default].

Id. at 503. Thus Rule 55(c), as an "express[ion of] the traditional inherent equity power of the federal courts," 10A Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 2692 (1998), permits the consideration of a panoply of "relevant equitable factors." Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 96 (2d Cir. 1993). The "Rule 55(c) determinations are case-specific" and "must, therefore, be made in a practical, commonsense manner, without rigid adherence to, or undue reliance upon, a mechanical formula." Gen. Contracting & Trading, 899 F.2d at 112. While the three factors identified by Designs are certainly "important" and "familiar," Conetta, 236 F.3d at 75, and a district court "should" consider them, Coon, 867 F.2d at 76, the failure of a district court to expressly consider them does not necessarily constitute an

-19-

abuse of discretion. Likewise, the decision of the district court to accord dispositive weight to one of the familiar factors or other relevant equitable factors does not necessarily mean an abuse of discretion.

This flexibility is necessitated by the competing policies and values that underlie the concept of default. On the one hand, it "provide[s] a useful remedy when a litigant is confronted by an obstructionist adversary," and "play[s] a constructive role in maintaining the orderly and efficient administration of justice." Enron, 10 F.3d at 96. It furnishes an invaluable incentive for parties to comply with court orders and rules of procedure. See Fed. R. Civ. P. 37(b)(2)(C). It encourages the expeditious resolution of litigation and promotes finality. See Wright, Miller & Kane, supra, § 2693. On the other hand, countervailing considerations include the goals of "resol[ving] cases on the merits," Key Bank of Me. v. Tablecloth Textile Co., 74 F.3d 349, 356 (1st Cir. 1996), and avoiding "harsh or unfair result[s]." Enron, 10 F.3d at 96. Since "default judgments implicate sharply conflicting policies . . . the trial judge, who is usually the person most familiar with the circumstances of the case and is in the best position to evaluate the good faith and credibility of the parties, is entrusted with the task of balancing these competing considerations." Eagle Assocs. v. Bank of Montreal, 926 F.2d 1305, 1307 (2d Cir. 1991)

(internal quotation marks omitted); see <u>Bond Leather Co.</u>, 764 F.2d at 938 (noting that "the district court, familiar with the parties and circumstances, is best situated to weigh the reasons for and against setting aside a default judgment" (internal quotation marks omitted)).

b.  The District Court's Findings

Eleven days after the clerk had entered the default against Designs, Schrader faxed a letter to the court in which he asserted that he had submitted a timely answer via Federal Express. In that letter, Schrader stated that the answer had been sent by a "temporary secretary" and that he had been told by Federal Express that "the packages were likely rejected because the federal express [sic] slip filled out was an **International** Air Waybill" (original emphasis).  Schrader indicated that he had been trying to get an affidavit from the temporary secretary who had been working that day.  He also told the court that he would submit to the clerk that same day a motion to vacate the default, along with an explanatory affidavit.  The motion and affidavit were not filed until one week later.

In response, KPS filed an affidavit from its New York counsel, Brian Schrader (no relation to David, Designs' counsel), in which he asserted that Federal Express would not have destroyed or lost the two packages sent to Boston.  He stated that he had tested David Schrader's explanation by sending a package to Hurvitz

-21-

in Boston with an international airbill instead of a domestic one, and that the package had arrived one day late.  He also stated that the name of the "temporary secretary" who had allegedly made the error had not been produced by Designs, even in response to a subpoena.  Hurvitz also submitted an affidavit stating that she had contacted Federal Express herself, and that Federal Express had assured her that they never destroy or dispose of a package.  Rather, if a package has the wrong type of waybill, Federal Express will either change the waybill itself or return the package to the sender to make the change; at most, a delay of one day would be incurred.  Brian Schrader's affidavit also included several representations concerning Designs' conduct in the New York litigation.  Designs had allegedly failed to comply with numerous discovery demands and engaged in bad-faith dilatory tactics.

The district court held a hearing on May 17, 2000, on Designs' motion to remove the default.  The court heard from Hurvitz and David Schrader.  Although Schrader had informed the court earlier that he would not be able to personally attend because of a conflict, he nevertheless managed to appear.  At the hearing, Schrader argued that the default should be set aside because (a) the default was not willful, (b) Designs had a meritorious defense, and (c) KPS could not show any prejudice.  Schrader focused on the willfulness factor.  Schrader also stuck to his story concerning the temporary secretary.  However, he provided

no affidavit from any temporary secretary despite his prior representation that he was attempting to obtain one. He now claimed that there was no way he could determine who the temporary secretary was because his firm had used "20 different secretaries over the course of the last two months." Moreover, he represented that, contrary to the affidavit filed by Brian Schrader, Designs had been complying with its responsibilities in the New York litigation and that the New York case was proceeding apace.

The district court was not impressed. First, commenting on the procedural history to that point, the court characterized Schrader's behavior as "stonewalling," and she admonished him in open court: "We have had trouble with you from the beginning." She noted his previous failures to meet deadlines and remarked on his duplicitousness, referencing his earlier representation that he could not attend the hearing and then his sudden appearance. She noted inconsistencies and implausibilities in Schrader's representations during the hearing about the late answer, and she found other representations he had made in affidavits to be incredible. The court explicitly disbelieved Schrader's story concerning the temporary secretary while believing the affidavit of the other attorney Schrader concerning Designs' intransigence in the New York litigation. These findings led to the dispositive ruling from the bench: "And because I do not credit these stories,

because I do not find there to be good cause to remove the default, the motion to remove the default is denied."

c.  Application of the Legal Standards

In making its ruling, the district court did not expressly cite the three factors emphasized by Designs (willfulness, a meritorious defense, and prejudice).  We have already concluded, however, that the lack of such an analysis does not necessarily mean that the district court abused its discretion.  Indeed, we think that the district court's ruling was entirely defensible.

By the time the district court denied Designs' motion to set aside the default, it had become well acquainted with the parties and circumstances in this case.  It had conducted two motion hearings and one pretrial conference.  It had received numerous written communications from counsel and had taken several motions (with supporting materials) under advisement.  Given the district court's familiarity with the case, and on the record developed in connection with the hearing, we cannot say that the district court clearly erred in its assessment of Schrader's credibility, nor did it clearly err in rejecting his proffered explanation for the default.

The burden of demonstrating good cause for the removal of a default rested with Designs.  See Bond Leather, 764 F.2d at 938.  Thus, Designs had the burden to demonstrate a lack of willfulness.

When the district court rejected Schrader's explanation, Designs was effectively left with no explanation for the default. Hence Designs' argument that the default was not willful lacked any factual predicate and was properly disregarded by the district court. Cf. id. (finding that "district court was within its rights" when it "expressly rejected [defendant's] proffered explanation of its failure to answer").

At the default hearing, Schrader also argued that Designs had a meritorious defense which weighed in favor of setting aside the default. The district court, however, had once before taken a dim view of Designs' asserted defenses when it granted KPS's request to issue trustee process. Thus we take the district court's comment on "stonewalling" to imply that it adhered to her prior skepticism about the defenses, and that it felt that Designs was merely trying to postpone the inevitable. Cf. Marziliano v. Heckler, 728 F.2d 151, 156 (2d Cir. 1984) ("[W]e infer from the court's emphasis on its duty to do justice to the litigants before it that the court was unpersuaded as to the merits of the . . . defense."). We cannot say that the court erred in its evaluation of Designs' defense. All of the materials offered by Designs in support of its defense were internally generated balance sheets, reports, and the like. KPS, on the other hand, attached copies of actual customer invoices and purchase orders to its complaint. Moreover, over the course of this dispute, the amount Designs

-25-

claims it is due from KPS has varied wildly: at one time nothing ("a wash"), at another $6,000, at another $30,000, at another $60,000, and finally over $74,000 (not including the $10 million claimed in the New York lawsuit).

Schrader also argued before the district court that KPS would suffer no prejudice if the default were to be set aside. Schrader was correct on this point. In response, KPS directs us to Chuang Investments v. Eagle Inns, Inc., 81 F.3d 13, 14 (1st Cir. 1996)(per curiam), for the proposition that prejudice is "inherent in needless delays and postponements." Chuang, however, concerned the dismissal of a plaintiff's case (and an entry of default on counter-claims) for failure to comply with discovery orders. See id. at 14 ("The grounds stated [in defendant's motion to dismiss] were the repeated failures of the [plaintiffs] to respond to discovery requests."). We have stated elsewhere that in the context of a Rule 55(c) motion, delay in and of itself does not constitute prejudice. "The issue is not mere delay, but rather its accompanying dangers: loss of evidence, increased difficulties of discovery, or an enhanced opportunity for fraud or collusion." FDIC v. Francisco Inv. Corp., 873 F.2d 474, 479 (1st Cir. 1989). There is no indication that any of these dangers were present or considered by the district judge when she ruled on the Rule 55(c) motion.

The district court, however, correctly gave significant weight to two other factors — the nature of Designs' explanation for the default, and the good faith of the parties. See McKinnon, 83 F.3d at 503. The district court determined that Schrader had fabricated his explanation regarding the filing of an answer — a finding that goes to the nature of the explanation as well as to Designs' good faith. We have noted before that "courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1119 (1st Cir. 1989) (quoting Wyle v. R.J. Reynolds Indus., 709 F.2d 585, 589 (9th Cir. 1983)); see also id. (quoting Link v. Wabash R.R. Co., 370 U.S. 626, 630-31 (1962)) ("It is apodictic that federal courts possess plenary authority 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'"). In light of these determinations of fabrication and bad faith, and its consideration of other salient factors, the district court did not abuse its discretion in refusing to set aside the default.

## 2. Rule 60(b) Relief

On June 15, 2000, Designs filed "a motion pursuant to FRCP 60(b) for reargument and reconsideration of [the district court's] May 17, 2000 bench decision denying Designs' motion to vacate the default entered against it." In support of this motion,

Designs argued the same points it had argued previously — a lack of willfulness, a lack of prejudice, and a meritorious defense. On July 26, the court endorsed the cover of Designs' Rule 60(b) motion: "Motion for reconsideration allowed. Upon reconsideration, the court affirms its decision denying the motion to vacate default."

Designs' Rule 60(b) motion sought relief from the district court's order denying its request to set aside the default.[3] Designs' appellate brief makes clear, however, that it now seeks Rule 60(b) relief from judgment under a theory never presented to the district court. Relying principally on Community Dental Services v. Tani, 282 F.3d 1164, 1170 (9th Cir. 2002), Designs argues that it is entitled to relief under Rule 60(b) on the basis of "excusable neglect" or "extraordinary circumstances" — namely, that its attorney Schrader was "grossly negligent in fabricating a false explanation" and that it would be "grossly inequitable to sanction the client" who was "victimized" by its attorney. Thus, according to Designs, the district court "was obliged to vacate the default judgment against FMC under Rule 60(b) of the Federal Rules of Civil Procedure." We disagree.

_____

[3] A motion filed under Rule 60 permits a party to seek "Relief From Judgment or Order." Fed. R. Civ. P. 60. Typically, a Rule 60(b) motion seeks relief from judgment. In this case, Designs' Rule 60(b) motion sought relief from the court's order "denying [Designs'] motion to vacate the default entered against it." The motion could not (and did not) seek relief from judgment because the court had yet to enter judgment.

-28-

In Tani, a trademark infringement case, Tani's lawyer had repeatedly failed to file and serve a stipulation and answer, despite representing to the court at an initial conference that he had done so, and despite being ordered at a subsequent conference to do so. When the plaintiff later moved for a default judgment and injunction, Tani's lawyer failed to file a memorandum in opposition, and the district court granted the plaintiff's motion. All the while, Tani's lawyer had been assuring his client that he was handling the litigation and that the case was going well. Tani only learned of the default judgment entered against him when he received a copy of it at his office. Tani then dismissed his derelict attorney, retained new counsel, and filed a Rule 60(b) motion for relief from judgment. The district court denied the request, holding that a client is bound by the actions (or inaction) of his attorney. On appeal, the Ninth Circuit vacated the judgment, concluding that "conduct on the part of a client's alleged representative that results in the client's receiving practically no representation at all clearly constitutes gross negligence, and vitiating [sic] the agency relationship that underlies our general policy of attributing to the client the acts of his attorney." Id. at 1171. According to the Tani court, since the client was not at fault, the district court erred in imputing the attorney's conduct to the client. See id. at 1172 ("It is

-29-

clear from the record that any culpable conduct was committed by [Tani's laywer], not Tani.").

There are two serious flaws in Designs' reliance on the Ninth Circuit's decision in Tani. First, in this circuit we have consistently "turned a deaf ear to the plea that the sins of the attorney should not be visited upon the client." Farm Constr. Servs., Inc. v. Fudge, 831 F.2d 18, 21 (1st Cir. 1987). We need not decide, however, whether to make an exception to this widely accepted rule because of the second defect in Designs' argument: "It is hornbook law that theories not raised squarely in the district court cannot be surfaced for the first time on appeal." Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 749 (1st Cir. 1995).

The cases cited by Designs are not to the contrary. In Tani the defendant dismissed his "grossly negligent" counsel, and Tani's new counsel sought 60(b) relief in the first instance in the district court. See Tani, 282 F.3d at 1167. In Carter v. Albert Einstein Medical Center, 804 F.2d 805 (3d Cir. 1986), the plaintiff discharged his attorney and, proceeding pro se, first sought Rule 60(b) relief in the district court under a "gross negligence" theory prior to making the same argument on appeal. Id. at 806-07; see also Boughner v. Sec'y of HEW, 572 F.2d 976, 977 (3d Cir. 1978) (Rule 60(b) claim first raised in district court by new counsel). The final case cited by Designs, Shepard Claims Service, Inc. v.

William Darrah & Associates, 796 F.2d 190 (6th Cir. 1986), is altogether inapposite in that it concerns a Rule 55(c) motion to set aside the entry of default (not a Rule 60(b) motion to set aside a default judgment).  The appellate courts subscribing to Designs' "gross negligence" theory of relief have thus required the claim to be raised first in the district court — properly so, in our view, given "the superior opportunity for the trial judge to assess the challenged conduct."  Carter, 804 F.2d at 807.  We therefore reject Designs' claim for Rule 60(b) relief.

## C.  The Calculation of Damages

In its order of July 27, 2000, the district court indicated that no hearing was necessary to determine the base quantum of damages[4] since "the verified complaint and plaintiff's affidavit attached thereto set forth a sum certain based on sales and commission figures there detailed."  The order also referred the matter to the magistrate judge for a hearing on Chapter 93A liability.  The order did not, however, identify the amount of this "sum certain."  The district court subsequently clarified the amount of damages on September 28, 2001, when it overruled Designs' objections to the magistrate judge's Report and Recommendation on the doubling of damages under Chapter 93A:  "Judgment may be entered for plaintiff in double the amount of its damages of

---

[4] By "base quantum" we mean the amount of compensatory damages to which KPS was entitled prior to any doubling under Chapter 93A.

$183,577." The district court apparently arrived at this sum by looking to the ad damnum clause of the complaint.

Designs argues two related points with respect to the district court's calculation of damages. First, Designs argues that KPS's claim was not for a "sum certain" and that the district court erred in thereby fixing the base quantum of damages on the basis of the complaint, without a hearing. Second, Designs argues that the district court erred in limiting the scope of the hearing before the magistrate judge to the issue of liability for multiple damages under Chapter 93A.[5] Designs maintains that it was entitled to an evidentiary hearing to determine the base quantum of damages, notwithstanding any admissions made as result of its default or the amount claimed in the ad damnum clause.

The district court's order of July 27, 2000, as clarified by its memorandum and order of September 28, 2001, was entered pursuant to Rule 55(b), which provides in pertinent part:

> If, in order to enable the court to enter judgment or to carry it into effect, it is necessary to take an account or to determine the amount of damages or to establish the truth of any averment by evidence or to make an investigation of any other matter, the court may conduct such hearings or order such references as it deems necessary and proper and shall accord a right of trial by jury to

---

[5] Designs was not permitted to challenge the base quantum of damages at the hearing before the magistrate judge. In accordance with the July 27 order, the magistrate judge limited the scope of that hearing to the issue of multiple damages under Chapter 93A. See infra Part II(D).

-32-

> the parties when and as required by any
> statute of the United States.

Fed. R. Civ. P. 55(b)(2) (emphasis added).  On the basis of its conclusion that "the verified complaint and plaintiff's affidavit attached thereto set forth a sum certain," the district court determined that no evidentiary inquiry was necessary to calculate the amount of damages to be set forth in the default judgment.[6]  We review the district court's refusal to inquire further for abuse of discretion.  See HMG Prop. Investors, Inc. v. Parque Indus. Rio Canas, Inc., 847 F.2d 908, 919 (1st Cir. 1988) ("We review a determination that a hearing was not compulsory under Rule 55(b) only for abuse of discretion.").

---

[6] The district court's denomination of KPS's claim as a "sum certain" uses a phrase found in subsection (b)(1), the only place in Rule 55 where the term "sum certain" appears:

> When the plaintiff's claim against a defendant is for a
> sum certain or for a sum which can by computation be made
> certain, the clerk upon request of the plaintiff and upon
> affidavit of the amount due shall enter judgment for that
> amount and costs against the defendant, if the defendant
> has been defaulted for failure to appear and is not an
> infant or incompetent person.

Fed. R. Civ. P. 55(b)(1).  However, by its own terms, this subsection only applies "if the defendant has been defaulted for failure to appear." Id.  By the time the default had been entered, Designs had undeniably "appeared" in the action.  See N.Y. Life Ins. Co. v. Brown, 84 F.3d 137, 142 (5th Cir. 1996) (holding that participation in telephone conference before magistrate judge constitutes "appearance" for Rule 55 purposes).  Thus subsection (b)(1) is inapplicable in this case to the determination of damages after the entry of default.

-33-

We conclude that the district court abused its discretion in failing to conduct further inquiry before fixing the base quantum of damages. There are two reasons why further inquiry was required. First, there are obvious discrepancies between the damages claimed in the body of the complaint and the damages requested in the ad damnum clause, as well as serious arithmetical errors in the affidavit filed with the complaint. Second, even without these errors and discrepancies, there would still be a need for further inquiry given the nature of KPS's claim.

According to the face of the complaint, KPS claims that it is entitled to $67,238 in base commissions and $63,795 in "sales price differentials," i.e., price mark-ups beyond cost. Adding these two figures results in a total of $131,033. However, in the enumerated counts and ad damnum clause, the complaint states that KPS is entitled to judgment against Designs in the amount of $183,577 — an unexplained difference of over $50,000. Likewise, KPS's affidavit filed in support of its complaint contains several computational errors. Signed by Sayles, the affidavit lists accounts from six different retailers, with commissions calculated at several different rates depending on the retailer. To take one account as an example, KPS claims that the cost differential for Gottschalk's department store was supposed to be calculated at 9.54% based on a sales volume of $196,684, for a total of $18,668. However, 9.54% of $196,684 is $18,764. More glaringly, the

-34-

affidavit concludes that the "total of the above amounts due from Designs is $183,577," yet the individual subtotals add up to approximately $160,000 — an unaccounted-for difference of over $23,000.  Moreover, many of the accountings and purchase orders attached as exhibits to the complaint's supporting affidavit are illegible or incomprehensible.  Given these inconsistencies and errors, the district court erred in simply fixing the base quantum of damages at the amount stated in the complaint's ad damnum clause.  See Transatl. Marine Claims Agency v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997) ("While the District Court may not have been obligated to hold an evidentiary hearing, it could not just accept [plaintiff's] statement of the damages."); Flaks v. Koegel, 504 F.2d 702, 707 (2d Cir. 1974) ("While a default judgment constitutes an admission of liability, the quantum of damages remains to be established by proof unless the amount is . . . susceptible of mathematical computation.").

Even if KPS's complaint and affidavit were free from the discrepancies and errors detailed above, the district court could not have determined damages without a further evidentiary inquiry. Following the entry of default, a district court can enter a final judgment without requiring further proof of damages only in limited situations.  For example, no evidentiary inquiry is necessary if

the claim is for a "sum certain."[7] See 10 Moore's Federal Practice ¶ 55.22[1] (2002) ("In cases where the court has entered default judgment and the claim is for a sum certain, the court can enter the default judgment for the amount stated in the complaint."); accord Farm Family Mut. Ins. Co. v. Thorn Lumber Co., 501 S.E.2d 786, 790 (W. Va. 1998) (indicating that "if the damages sought by the party moving for a default judgment are for a sum certain, or an amount which can be rendered certain by calculation, no evidentiary hearing on damages is necessary"); cf. Fed. R. Civ. P. 55(b)(1) (authorizing court clerk to enter default judgment sine decreto when claim is for sum certain and defendant has failed to appear).

Contrary to the district court's statement, this is not a sum certain case.[8] In the Rule 55 context, a claim is not a sum certain unless there is no doubt as to the amount to which a plaintiff is entitled as a result of the defendant's default. See,

---

[7] As one court has noted, "the cases discussing the sum certain requirement of Rule 55 are few and far between and rather exiguous in their reasoning." Collex, Inc. v. Walsh, 74 F.R.D. 443, 450 (E.D. Pa. 1977); see also Byrd v. Keene Corp., 104 F.R.D. 10, 12 (E.D. Pa. 1984) ("Relatively few cases have raised the question of what qualifies as a 'sum certain' for the purposes of Rule 55(b)."). Given this paucity of federal case law, we will look to states whose rules of procedure mirror the Federal Rules of Civil Procedure in the analysis that follows.

[8] As we noted in footnote 6, supra, the phrase "sum certain" only appears in Fed. R. Civ. 55(b)(1), applicable only "if the defendant has been defaulted for failure to appear." Nevertheless, the concept of a "sum certain" is relevant to the question under Rule 55(b)(2) of whether a further evidentiary inquiry is necessary before the determination of damages.

e.g., Reynolds Sec., Inc. v. Underwriters Bank & Trust, Co., 378 N.E.2d 106, 109 (N.Y. 1978) ("The term 'sum certain' in this context contemplates a situation in which, once liability has been established, there can be no dispute as to the amount due, as in actions on money judgments and negotiable instruments."); see also Interstate Food Processing Corp. v. Pellerito Foods, Inc., 622 A.2d 1189, 1193 (Me. 1993) ("Such situations include actions on money judgments, negotiable instruments, or similar actions where the damages sought can be determined without resort to extrinsic proof."). The First Circuit case cited by the district court in its July 27 order, Brockton, was just such a case — an action to collect on an unpaid certificate of deposit. See Brockton, 771 F.2d at 13. The instant appeal is clearly not such a case.[9]

---

[9] Neither the fact that the complaint identifies a purported aggregate total, nor the fact that the affidavit attests to such a sum, automatically converts KPS's claim into a "sum certain."

> Courts considering the question are clear that a claim is not for a "sum certain" merely because the demand in the complaint is for a specific dollar amount. A contrary holding would permit almost any unliquidated amount to be transformed into a claim for a sum certain simply by placing a monetary figure on the item of claimed damage, even though that amount has not been fixed, settled, or agreed upon by the parties and regardless of the nature of the claim.

Farm Family Mut. Ins. Co., 501 S.E.2d at 791; accord Zorach v. Lenox Oil Co., 1996 Mass. App. Div. 11, 13 (1996) ("Merely requesting a specific amount in the complaint or statement of damages does not fulfill the sum certain requirement.").

-37-

As with a "sum certain," a hearing is not normally required if the claim is "liquidated." See 46 Am. Jur. 2d Judgments § 313 ("As a general proposition, in the context of a default judgment, unliquidated damages normally are not awarded without an evidentiary hearing; that rule, however, is subject to an exception where the amount claimed is a liquidated sum or one capable of mathematical calculation."). "'Liquidated' means adjusted, certain, settled with respect to amount, fixed. A claim is liquidated when the amount thereof has been ascertained and agreed upon by the parties or fixed by operation of law."[10] Farm

_____

[10] Some courts and commentators appear to use the terms "sum certain" and "liquidated claim" interchangeably. See, e.g., Farm Family, 501 S.E.2d at 791 ("Other jurisdictions considering the term 'sum certain' have suggested that its meaning is similar to 'liquidated amount.'"); 46 Am. Jur. 2d Judgments § 291 ("The 'sum certain' requirement is clearly met where the claim is for liquidated or statutory damages and clearly not met where the claim is for unliquidated damages."). Other authorities put a more distinguishing gloss on the terms. For example, Black's Law Dictionary (7th ed. 1999) defines "sum certain" as

> 1. Any amount that is fixed, settled, or exact.
> 2. *Commercial law.* In a negotiable instrument, a sum that is agreed on in the instrument or a sum that can be ascertained from the document.

Id. at 1449. It defines a "liquidated claim" as "[a] claim for an amount previously agreed on by the parties or that can be precisely determined by operation of law or by the terms of the parties' agreement." Id. at 240. The text of Rule 55 appears to distinguish between a "sum certain" and "a sum which can by computation be made certain" (i.e., liquidated damages). See Fed. R. Civ. P. 55(b)(1). In deciding this appeal, we need not definitively delineate the respective ambits of the terms "sum certain" and "liquidated claim." It is enough for us to conclude that KPS's claim is neither one.

<u>Family Mut. Ins.</u>, 501 S.E.2d at 791 (quoting <u>Hallett Constr. Co.</u> v. <u>Iowa State Highway Comm'n</u>, 139 N.W.2d 421, 426 (Iowa 1966)).  The classic example is an enforceable liquidated damages clause in a contract.  <u>See</u> 22 Am. Jur. 2d Damages § 683.  Another example would be a delinquent tax assessment.  <u>United States</u> v. <u>Raleigh Rest.</u>, 398 F. Supp. 496, 498 (E.D.N.Y. 1975).  KPS and Designs, however, vigorously dispute the issue of damages.  Likewise, KPS's damages have not been fixed by operation of law.  Finally, as the inconsistences and inaccuracies in the complaint and the supporting affidavit amply demonstrate, KPS's claims are not capable of simple mathematical computation.  Thus, KPS's complaint and its supporting affidavit do not state a liquidated claim.

Relying on the erroneous conclusion that KPS's claim stated a claim for a sum certain, the district court did not look beyond the complaint's <u>ad</u> <u>damnum</u> clause and an internally inconsistent supporting affidavit in fixing the base quantum of damages.  For the reasons explained above, this limited approach was an abuse of discretion requiring that we remand the matter to the district court for further consideration of the damages issue.  However, Designs is not necessarily entitled to an evidentiary <u>hearing</u> on remand.  In limited circumstances we have permitted district courts to dispense with a Rule 55(b)(2) hearing, even in the face of apparently unliquidated claims.  <u>See</u> <u>e.g.,</u> <u>HMG</u>, 847 F.2d at 919 (holding that district court, "intimately familiar with

the case from years of travail," did not abuse discretion when it forwent hearing and calculated damages from "mortgage and loan agreements, certifications by the taxing authorities, and other documents of record"). Other circuits are in agreement. See, e.g., Action S.A. v. Marc Rich & Co., Inc., 951 F.2d 504, 508 (2d Cir. 1991) (holding that full evidentiary hearing not required when court had been "inundated with affidavits, evidence, and oral presentations by opposing counsel"); Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc., 722 F.2d 1319, 1323 (7th Cir. 1983) (holding that district court did not abuse discretion by failing to hold hearing when amount claimed was "capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits"). We decline to decide whether the instant case would lend itself to resolution without an evidentiary hearing, leaving that determination to the sound discretion of the district court on remand. In making this determination, the district court may, of course, consider any evidence submitted at the Chapter 93A hearing.[11]

**D. The Chapter 93A Claim**

Section 2 of Chapter 93A of the Massachusetts General Laws prohibits "[u]nfair methods of competition and unfair or

---

[11] Given the history of misrepresentations from Designs, Nussen, and their trial counsel, we remind the parties that it is well within the power of the district court to impose sanctions for any misrepresentations made on remand as to damages. See Fed. R. Civ. P. 11(c).

-40-

deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws Ann. ch. 93A, § 2 (West 2002). Upon a finding that a defendant has violated section 2, the court can award a plaintiff compensatory damages. "[R]ecovery shall be in the amount of actual damages; or up to three, but not less than two, times such amount if the court finds that the [conduct] was a willful or knowing violation of said section two." Id. § 11.

> The court's order of July 27, 2000, provided as follows:

>> Upon consideration of both plaintiff's request for hearing on assessment of damages on Count III, and defendant's opposition thereto with supporting and supplemental memoranda and documents, plaintiff's request is granted. It is ordered that this matter be referred to the Magistrate Judge for a hearing on damages under Mass. Gen. Laws, ch. 93A, Count III of the complaint.

On January 29, 2001, after an adverse evidentiary ruling from the magistrate judge,[12] counsel for KPS wrote the magistrate judge, stating: "I am writing to inform the Court that KPS hereby waives an evidentiary hearing on assessment of damages under Chapter 93A. Instead, in pursuing its claim for multiple damages under Chapter 93A, KPS will rely solely on the allegations of the Complaint and the reasonable inferences to be drawn therefrom." Soon thereafter, Designs, which only a few months before objected to any sort of

---

[12] The magistrate judge ruled on December 6, 2000, that KPS would not be permitted to introduce evidence concerning events which post-dated the activities described in the complaint — in particular, evidence concerning the New York litigation.

-41-

hearing, demanded an evidentiary hearing on the issue of willfulness. Designs argued that, even if the default had established a 93A violation, Designs' conduct was not "knowing or willful" and that KPS was thus not entitled to any doubling or trebling of damages. Designs also maintained that the allegations of the complaint failed to state a claim for relief under Chapter 93A and that the claim should be rejected on that ground as well.

At hearings on May 9 and June 11, 2001, the magistrate judge made clear his position: the district court had already determined that the complaint stated a claim for relief under Chapter 93A, and the sole purpose of the referral was to determine whether KPS was entitled to a doubling or trebling of damages, i.e., to determine whether Designs' conduct was "willful or knowing." The magistrate judge ruled that he would permit testimony only on that one issue. He then asked counsel for Designs if Designs, in light of that ruling, still wished to go forward with the evidentiary hearing. Counsel for Designs responded in the affirmative.

The magistrate judge then conducted an evidentiary hearing at which he heard testimony from Nussen and Designs' accounts receivable clerk. On August 3, 2001, the magistrate judge issue a Report and Recommendation. In it, he found that Designs, "by and through its principal, Nussen, knowingly and willfully refused to pay KPS commissions due and owing in violation of known

-42-

contractual obligations." The magistrate judge therefore recommended an award of double damages under Chapter 93A. Designs timely filed objections to the Report and Recommendation, each of which the district court overruled.

## 1. Willfulness

We review the magistrate judge's factual determination of willfulness for clear error. Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc., 754 F.2d 10, 18-19 (1st Cir. 1985). Designs tries to paint Nussen as a reasonable businessman who only refused to pay because he believed "an accounting showed that KPS owed money to Designs." Designs argues that "uncontradicted" testimony by Nussen demonstrated that at the time Designs terminated KPS's contract, Nussen honestly believed that KPS owed Designs money. While we do not dispute Designs' contention that a "good faith dispute as to whether money is owed . . . is not the stuff of which a c. 93A claim is made," Duclersaint v. Fed. Nat'l Mortgage Ass'n, 696 N.E.2d 536, 540 (Mass. 1998), the Massachusetts Supreme Judicial Court has made clear that "conduct 'in disregard of known contractual arrangements' and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes." Anthony's Pier Four, Inc. v. HBC Assocs., 583 N.E.2d 806, 821 (Mass. 1991) (quoting Wang Labs., Inc. v. Bus. Incentives, Inc., 501 N.E.2d 1163, 1165 (Mass. 1986)). The magistrate judge

-43-

had ample evidence before him to find that Designs (through Nussen) had willfully evaded its known contractual obligations to KPS.

In his Report and Recommendation, the magistrate judge wrote:

> [D]efendant's proffered justification was and is clearly unadorned pretext without any factual basis whatsoever. Nussen said that he did not pay the commissions because he thought it was a "wash." Yet, he never said that in response to the formal demand. To the contrary, Nussen's so-called "wash," shortly after that demand for an accounting and payment, found new life in a state-filed complaint in which he alleged that KPS owed Designs no less than $5,000,000. It is clear to this court, from the fact that Nussen never meaningfully responded to plaintiff's formal demand for payment, and from all that Nussen said, that his true motivation was, as he so testified, that he was irked by reason of the fact that he thought Sayles and KPS served others as well in the distribution of jewelry while representing Designs. But that is hardly justification for evading known contractual obligations. Even assuming that KPS should not have represented others while representing [Designs] (and that is not the case [by virtue of the well-pleaded allegation in paragraph 20 of the complaint, admitted by default]), Nussen's self-help conduct of simply refusing to pay moneys due and owing to KPS is simply the inappropriate and inexcusable response.

The magistrate judge's conclusions are not clearly erroneous. At the damages hearing Nussen was an evasive witness, repeatedly refusing to give direct answers to questions posed by opposing counsel and questions posed by the court. He repeatedly contradicted himself on the witness stand and was impeached with

his own affidavit filed that morning in connection with (yet another) motion to dismiss. Morever, any belief that Nussen had with regard to the amount KPS allegedly owed Designs could hardly be considered "honest" in light of Nussen's wildly morphing claims — over the course of this dispute, Nussen has claimed that KPS owed Designs $60,000, at another point $30,000, elsewhere $6,000, and finally, as the magistrate noted in the excerpt quoted above, that Nussen considered it all "a wash" (leaving aside the claim for over $5,000,000 in the New York lawsuit). The record clearly supports the magistrate judge's factual finding on the willfulness of Nussen's and Designs' conduct.

### 2. The Sufficiency of the 93A Allegations

Designs argued before the district court, and now argues here, that the factual allegations deemed admitted by virtue of its default do not constitute a 93A violation. In effect, Designs seeks to dismiss the 93A count for failure to state a claim, notwithstanding the entry of default. See Fed. R. Civ. P. 12(b)(6). The district court assumed it could entertain such an argument and then summarily disposed of it. We do the same.[13]

---

[13] Although the authorities are not uniform, the prevailing view is that an entry of default prevents the defendant from disputing the truth of the well-pleaded facts in the complaint pertaining to liability. But, the defendant may still contest a claim on the ground that the complaint does not allege facts that add up to the elements of a cause of action.

a.   The Business Relationship

The protections of Chapter 93A are not available to parties in a strictly private transaction, "where the undertaking is not 'in the ordinary course of a trade or business.'" Linkage Corp. v. Trustees of Boston Univ., 679 N.E.2d 191, 207 n.33 (Mass. 1997) (quoting Lantner v. Carson, 373 N.E.2d 973, 975 (Mass. 1978)).  Thus "intra-enterprise" transactions do not fall within the statute's purview.  Included in this classification are "disputes stemming from an employment relationship, disputes between individual members of a partnership arising from partnership business, and transactions and disputes between parties to a joint venture and between fellow shareholders." Id.  Designs tries to avail itself of this "intra-enterprise" exemption by claiming that KPS's claims constitute a "private grievance," the result of an "internal business dispute," and not an "arms-length commercial marketplace transaction."  This argument contradicts the well-pleaded allegations deemed admitted by operation of Designs' default and defies common sense.  The complaint alleged that KPS was a Florida corporation with its principal place of business in Massachusetts, and that Designs was a New York corporation with its principal place of business in Brooklyn.  It also alleged that: (1) KPS was an independent sales representative; (2) certain

Conetta, 236 F.3d at 75-76 (internal quotation marks and citations omitted).  We assume, without deciding, that this case lends itself to such an argument.

-46-

agreements confirmed that independent status; and (3) the relationship was not exclusive. On these admitted facts, we can only conclude that this arrangement constituted "an arm's-length transaction between two corporations under which [plaintiff] provided services to [defendant] and received compensation." Linkage, 679 N.E.2d at 207.

> b. The Unfair or Unscrupulous Conduct

Designs next argues that Designs' mere "refusal to pay Sayles' demand was not an unfair or unscrupulous response," and thus does not fall within the ambit of Chapter 93A. The complaint, however, alleged that Designs (1) refused to pay KPS or provide any statements and accountings, despite repeated demands to do so; (2) used erroneously low commission rates; (3) demanded, without justification, that KPS stop dealing with Jasco, threatening to unilaterally terminate Designs' contract with KPS unless KPS complied; (4) carried through on that threat; and (5) arbitrarily decided to limit KPS's commissions to orders received less than ninety days after Designs had unilaterally terminated its contract with KPS. All of these allegations were deemed admitted as a result of Designs' default. As a matter of law, the complaint alleges conduct sufficiently unscrupulous and unfair to state a 93A

claim.  See Anthony's Pier Four, Inc. 583 N.E.2d at 821. (Mass. 1991).[14]

        c.  Primarily and Substantially Within Massachusetts

The conduct proscribed by Chapter 93A will only give rise to a valid claim if "the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive practice occurred primarily and substantially within the Commonwealth [of Massachusetts]." Mass. Gen. Laws Ann. ch. 93A, § 11 (West 2002).  In determining whether the conduct occurred "primarily and substantially" in Massachusetts, we will look to three factors:  (1) where the defendant engaged in unfair or unscrupulous conduct; (2) where the plaintiff was on the receiving end of the unfair or unscrupulous conduct; and (3) the situs of plaintiff's losses due to the unfair and unscrupulous conduct. Roche v. Royal Bank of Can., 109 F.3d 820, 829 (1st Cir. 1997); Clinton Hosp., 907 F.2d at 1265-66.

As for the first factor, Designs argues that it is a New York corporation, with no office or showroom in Massachusetts, and that Sayles would travel to New York to meet with Nussen.  This may be true.  The complaint, however, alleged that Designs contracted with KPS to secure new accounts for Designs with several different

---

[14] The magistrate judge noted that, even if the district court had not ruled that KPS was entitled to 93A relief as a matter of law by virtue of Designs' default, he would have still reached the same conclusion on the evidentiary record before him.

retailers in Massachusetts. The complaint also alleged that after KPS had become entitled to commissions on the Massachusetts accounts, Designs repudiated its contract with KPS and shortchanged KPS through communications delivered to KPS in Massachusetts.

As for the second and third factors, they both weigh heavily on the side of KPS. The complaint alleged that KPS had secured accounts for Designs with retailers whose "usual place[s] of business" were in Massachusetts. Thus KPS's unpaid commissions accrued in Massachusetts. The complaint also alleged that KPS's principal place of business was in Massachusetts when it became the target of the unfair and unscrupulous conduct. Therefore, for Chapter 93A purposes, on the basis of the facts deemed admitted, we conclude that the unfair and unscrupulous conduct at issue occurred primarily and substantially within the Commonwealth of Massachusetts.

### 3. The Remand

Finally, we note that the sole issue before the magistrate judge was the nature of Designs' conduct and whether it was "willful or knowing" under Chapter 93A. We affirm the magistrate judge's "willfulness" determination and his award of double damages. The fact that we are remanding is unrelated to the award of double damages, and the issue of "willfulness" under Chapter 93A should not be revisited on remand. Whatever the district court finds to be the proper base quantum of damages, that

-49-

amount should be doubled as a result of our affirming the 93A rulings, and judgment should be entered accordingly.

**E.  Sanctions**

### 1.  In the District Court

Designs has put forward no argument with respect to its appeal of the district court's order imposing $5,000 in sanctions. "An appellant waives any issue which it does not adequately raise in its initial brief." Playboy Enters., Inc. v. Pub. Serv. Comm'n of P.R., 906 F.2d 25, 40 (1st Cir. 1990).  We will therefore affirm the district court's order imposing sanctions.[15]

### 2.  On Appeal

The acrimony which permeated the district court proceedings has spilled over on appeal.  Prior to oral argument, Designs filed a motion for sanctions against KPS pursuant to our Local Rule 30(e), claiming that KPS unreasonably and vexatiously increased the costs of litigation through the inclusion of unnecessary materials in the joint appendix.  KPS filed an opposition brief in which it cross-moved for attorneys' fees and expenses incurred in responding to Designs' "frivolous motion." Having duly considered both requests, we find them meritless.  They are denied.

---

[15] For the same reason, we will not consider Designs' "suggestion" — made in a short footnote on the last page of its opening brief — that we reassign this case to a different judge on remand.  Such an argument would be baseless in any event.

**III.**

For the forgoing reasons, we affirm the district court's entry of a default judgment against Designs with respect to liability, and we affirm the doubling of compensatory damages under Chapter 93A. However, we vacate the district court's calculation of the base quantum of compensatory damages, and remand for further proceedings not inconsistent with this opinion.

Designs' motion for sanctions is hereby **DENIED**. KPS's cross-motion for attorneys' fees is hereby **DENIED**.

**AFFIRMED** **in part,** **VACATED** **in part, and** **REMANDED**.

Each party to bear its own costs.

**SO ORDERED**.